

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00198-CV

———————————————

IN THE INTEREST OF K.J. AND C.W., CHILDREN

---

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-707904-21

---

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellants T.T. (Mother) and R.J. (Father) appeal the termination of their parental rights to their sons K.J. (Keith)[2] and C.W. (Connor)[3] following a two-day bench trial.[4] The trial court terminated Mother's and Father's parental rights based on clear and convincing evidence of three predicate grounds—endangering environment, endangering conduct, and failure to comply with their court-ordered service plans—and the best-interest ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2). In five issues, Mother argues that the evidence is legally and factually insufficient to support the predicate-ground findings and the best-interest finding. In five issues, Father argues that the evidence is legally and factually insufficient to support (1) the trial court's Section 161.002(b) finding terminating his parental rights to Connor based on his failure to file an admission of

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). Both children are referred to using aliases.

[3]The corrected termination order describes Father as the alleged father of Connor based on the fact that he did not timely file an admission of paternity or a counterclaim for paternity or because Connor was under one year of age at the time the termination petition was filed and Father had not registered with the paternity registry.

[4]The trial took place on March 8, 2023, and April 18, 2023.

paternity or file with the paternity registry, (2) the three predicate-ground findings, and (3) the best-interest finding. We agree with Father that the evidence is insufficient to support the trial court's Section 161.002(b) finding and modify the corrected order to delete that ground. But because we hold that the evidence is legally and factually sufficient to support the trial court's endangering-conduct findings and the best-interest findings as to Mother and Father, we affirm as modified the trial court's corrected order terminating Mother's and Father's parental rights to Keith and Connor.

## II. Background

### A. Overview

Father first impregnated Mother when she was thirteen and he was fifteen, and he impregnated her again less than two years later. Mother gave birth to Keith when she was fourteen and to Connor when she was sixteen. At times, Mother indicated that she had been kidnapped by Father and his mom and that they had induced her to have babies by promising to give her a home. At other times, Mother denied that she had been forced to do anything and said that living with Father's mom was the safest place for her to be, despite that Mother had run away multiple times even when she was staying with Father's mom. The record details the instability of Mother and Father—two teenagers who had not yet matured to the point of being autonomous adults and who had not demonstrated the ability to parent two young boys who need ongoing medical care, including speech and physical therapy.

3

**B.     The Removal Affidavit**

On October 2, 2021, the Department of Family and Protective Services received multiple referrals concerning Mother's treatment of Connor. Allegations of neglectful supervision, physical neglect, and physical abuse arose after people heard Mother telling Connor (who was not even a month old) to "shut up." It was also reported that Mother, who was a minor, had been seen drinking alcohol.

When the Department's investigator spoke with Mother's adult brother two days later, he said that Mother had been living with him, his siblings, and their mother since March 2021 but had crawled out a window with Connor and had run away from the home on October 2, 2021. Mother's brother said that they had received information from Mother's high school alerting them that Mother had expressed an intent to kill herself. The Department's investigator contacted the school counselor who confirmed that Mother had twice expressed suicidal ideations.

The investigator also called and spoke with Father's sister. She said that her mom, Father, and Keith were living with her in Los Angeles, but she would not provide an address.

After twelve days had elapsed since the initial referrals and all searches for Mother had been futile, the Department contacted the National Center for Missing and Exploited Children, which distributed posters with Mother's picture and information.

4

On October 20, 2021, the Department received a new report with information that both Keith and Connor had been seen at a Tarrant County domestic-violence shelter with Father's mom, Father, and Mother. The report noted that Father had called the police on the night of October 19, 2021; that he was arrested on outstanding warrants; that Mother had fled the shelter; and that both children were left with Father's mom, who had been going by a different name at the shelter and who had given a different name for Mother.

On October 21, 2021, Father's mom was arrested for harboring a runaway.[5] Because the children were left with no one to care for them, they were taken into the Department's care.

The removal affidavit set forth extensive prior CPS history. The affidavit noted that during a previous CPS case's closure visit, Mother had made outcries about her time at Father's mom's residence, stating that she was coerced by Father and his mom to have a child in return for a house. Mother said that Father and his mom had orchestrated her disappearance when she was twelve years old and had supplied her with a bus ticket and instructions on how to get to their residence. During the three years that Mother had been living with them, she had been impregnated twice by Father and had been hidden from her own mother. During the prior case's closure visit, Mother stated that she did not think she could get Keith back because Father

---

[5]Testimony at trial explained that Father's mom had been harboring a fifteen-year-old girl.

and his mom had forced her to sign a paper that they said gave them full custody of Keith. Mother broke down and said that when she had asked for food, they would not give it to her and that they had beaten her. The prior CPS history from March 2021 mentioned food insecurity while Keith was living with Father and Father's mom and their failure to take Keith to a pediatrician.

With regard to Mother's pregnancy with Connor, the removal affidavit referenced hospital notes from July 2021 (when Mother was seen while she was pregnant with Connor), stating that the father of the unborn baby was not involved, that the relationship was "kidnapper," that she had been "kidnapped for four years," and that the pregnancy was a "planned pregnancy."

### C. The Trial

#### 1. The Investigator

The Department's investigator testified that the initial referral was for neglectful supervision and physical abuse of one-year-old Keith and of newborn Connor. Specifically, Mother, who was sixteen years old at the time, had been reported as a runaway; she had left her mother's home with Connor in the middle of the night and did not have any of the necessities to provide for his needs. Additionally, people had reported seeing Mother physically spanking Connor, who was three weeks old. The investigator said that Mother "had a long history of being a runaway as well as potentially being trafficked and was unstable." During the

investigation, the investigator learned that Mother had expressed suicidal ideations on a school computer.[6]

The Department received information in October 2021 that the children were staying at a domestic-violence shelter. The investigator learned that Mother had fled the shelter, that Father had been arrested on warrants for probation violations, and that Father's mom had been arrested for harboring a fifteen-year-old child as a runaway, thus leaving the children alone at the shelter.

The investigator testified that it was concerning that the children had been left with Father's mom (prior to her arrest) because she had prior CPS history from March 2021 that had resulted in a reason-to-believe disposition for neglectful supervision, physical abuse, and sexual abuse of Mother.[7] Father's mom additionally had a reason-to-believe disposition for medical neglect and neglectful supervision of Father.[8] Father also had CPS history from March 2021 that resulted in a reason-to-

---

[6] The school counselor testified that every student was given a Chromebook to use for class assignments and that the Chromebooks have a program on them that alerts the school's counselors when certain words are used. The school counselor received an alert from Mother's Chromebook when it detected the statement, "I want to kill myself." Mother initially denied typing the statement but ultimately admitted it. The school counselor was concerned that Mother would attempt suicide because of her relationship with her mother and because of things that Mother's mother had said to the counselor.

[7] Charges were filed against Father's mom for harboring a runaway—Mother.

[8] The CPS history set forth in the removal affidavit stated that Father had epilepsy and was not receiving medical treatment, despite having seizures at least twice per month.

believe disposition for sexual abuse of Mother. The investigator explained that the reason-to-believe disposition for sexual abuse of Mother by Father's mom and Father was based on a referral that Mother "had a history of being trafficked, potentially, sexually."

When asked what had led to the removal of the children, the investigator testified that Mother, Father, and Father's mom had left the children alone at the shelter due to Mother's fleeing the shelter and due to Father's and Father's mom's being arrested. The investigator disposed of the case as reason-to-believe for neglectful supervision of both children by Mother; the investigator did not make a finding on Father because the investigator was not able to locate Father until after the removal.[9] The investigator testified that as of the termination trial, Mother, Father, and Father's mom were living together and that he would have concerns if the children were returned to that home

> [g]iven the history with the family. And that [Mother] has been in and out of being trafficked essentially or -- or running away for the past three to four years; that [Father] has been in trouble with the law recently, and is potentially still on probation[;] and that [Father's mom] has been arrested recently for harboring a [runaway].

The investigator explained that the children are young and cannot self-protect and that the children rely on adults to care for them and to provide their food and shelter.

---

[9]The investigator testified that he never spoke with Mother because she was not located during his investigation and that he had last spoken with Father when he was in jail after the children's removal.

The investigator opined that Mother, Father, and Father's mom are not "able to do that for them."

### 2. Mother (During the Department's Case)

Mother, who was seventeen years old at the time of the termination trial, testified that she had met Father on Instagram when she was thirteen years old. At that time, Mother was living with her mother, whom she described as "[t]he abuser." Mother agreed that CPS had been in and out of their lives when Mother had lived with her mother.

Mother said that she had gone to live with Father and his mom when she was fourteen and that she had given birth to Keith at age fourteen. Mother testified that no one had forced her to live with Father and his mom; she did so because her mother was abusive. When asked whether Father or his mom had ever promised her anything if she would have babies for them, Mother responded, "No. That was a lie my mother told, and I listened to her conjure up that lie . . . that she told the CPS worker." Mother did not recall telling a CPS investigator on July 8, 2021, that she was not ready to have a baby but that Father and his mom had promised her a house if she had a baby and that she was "young and dumb" and so she had agreed to the offer.

When asked where she was living when she gave birth to Connor in September 2021, she said at her mother's house. She explained that the police had taken her back to her mother's house (presumably from Father's mom's house) even though

9

she told them not to because her mother was abusive to her. Mother said that while she was pregnant with Connor, her mother had kept her locked up and did not allow her to use the restroom when she needed to.

Mother said that when Connor was a newborn, she left her mother's house and ended up at a shelter with her children, Father, and his mom. When asked where she had gone after she had left the shelter (while her children, Father, and his mom remained there), Mother said, "I was taken." Mother explained that after she had left the shelter, "something [had] happened," but she did not remember where she ended up.

Mother did not learn that the Department had removed her children until Father was released from jail. Mother said that when she learned about her children, she came back to talk to the Department. Mother recalled that the Department had taken her to her father's house but that she had left because she wanted to go live with Father's mom.

Mother recalled going to the Unbound Underground shelter and then to the ACH Youth Shelter. Mother did not recall being kicked out of the ACH Youth Shelter and denied fighting anyone there. Mother admitted going to Jonathan's Place and then running away from there; she said that she did not feel safe because she was not with Father's mom, who was living at another shelter. In March 2022, Mother lived at a Motel 6 in Euless and then went to California to live with her children's paternal aunt; Mother said that Father's mom had paid to fly her to California.

10

Mother ran away from the aunt's home because she was not with Father's mom. Mother said that she was trying to find a grocery store in California when she was picked up by the police. Mother believed that Father's mom had paid to fly her back to Texas; she returned to Father's mom's house in Plano and lived with her and Father. When asked where else she would live if she were not allowed to live with Father's mom (whom she considered to be her mother), Mother said that was the safest place for her to be.

Mother testified concerning her service-plan compliance, beginning with her housing stability. Mother said that she had been living in the home with Father and his mom since July 2022 and was still living there at the time of the termination trial in March 2023. The house they were living in had four bedrooms, including a bedroom for the children. Mother said that it was her plan for the children to live with her in that home and that they would move somewhere else in the future.

Mother said that her last paycheck was from UPS in December 2022 for seasonal work; that she had last worked at UPS on February 29, 2023; and that she was "on the road to rehire" to make her a permanent employee by March 24, 2023. Mother said that her children would have medical insurance through her job at UPS. Mother said that she could financially support the children but that she would stay home to take care of them while Father and his mom worked.

Mother testified as to the many services that she had completed. She said that she had completed her FOCUS for Mothers class and an assessment with Recovery

11

Resource Council. Mother worked with her Unbound Underground/Traffick911 advocate, who provided services for Mother; Mother said that she had completed everything that the advocate had recommended, though the advocate did not provide a certificate of completion. Mother had not been in juvenile detention during the case. Mother said that she was unable to participate in Zoom Counseling because there was an issue on Our Community Our Kids' (OCOK)[10] end; Mother offered to pay out of pocket for counseling but received no response from her caseworker.[11] Mother testified that she had completed every service that was available to her.

Mother said that she went to her visits and that they were good when they had them but that there were times when the caseworker canceled after Mother had arrived without providing a reason.

---

[10]CPS is the former administrator of conservatorship services, which includes the foster-care, case-management, and family-reunification services provided by DFPS, a state agency. *See* Tex. Dep't of Fam. & Protective Servs., *Learn about DFPS*, https://www.dfps.texas.gov/About_DFPS/default.asp (last visited Sept. 27, 2023); *see also In re Tex. Dep't of Fam. & Protective Servs.*, 660 S.W.3d 248, 256 (Tex. App.—San Antonio 2022, orig. proceeding) (explaining that the legislature delegates authority to the Department). OCOK is one of the contractors that now provides conservatorship services on the Department's behalf, and an OCOK permanency specialist is the equivalent of a CPS caseworker. *See In re D.W.*, No. 02-22-00478-CV, 2023 WL 3370761, at *1 nn.3–4 (Tex. App.—Fort Worth May 11, 2023, no pet.) (mem. op.) (explaining relationship between the Department and OCOK); *see also* Tex. Fam. Code Ann. §§ 264.151–.172 (describing and providing requirements for the Department's oversight of community-based-care system for the State of Texas). For purposes of this opinion, OCOK and CPS may be read interchangeably.

[11]Mother's caseworker testified that she had told Mother that she could pay out of pocket if she wanted to.

Mother asked the trial court to deny the petition to terminate her parental rights and to name her the children's sole managing conservator, even though she later admitted that she did not know what that meant and that she wanted to share parental rights with Father.

On cross-examination by Father's counsel, Mother testified that Father had never laid hands on her or forced her to do anything, that he had never asked her age, and that she had never told him that she was thirteen.

### 3. Second Caseworker

Alexis Stocks, a permanency specialist with OCOK, testified that she had been assigned to the case in October 2022 after the initial OCOK worker, Elizabeth Ingraham, had left OCOK. Stocks testified that OCOK's concerns included that Mother and Father appeared to be very dependent on Father's mom, that Father's mom had prior reason-to-believe allegations related to her treatment of Mother and Father, their lack of employment, Mother's prior history of running away, Mother's "abuse history," Mother's mental health due to suicidal ideations, and Father's medical conditions and bare-minimum life skills.

Stocks testified about Mother's runaway status, as she was on runaway status for a majority of the case:

13

- Mother ran away from the domestic-violence shelter in October 2021 and remained missing until January 2022;[12]

- Mother fled from Jonathan's Place in February 2022;

- Stocks did not describe when or how Mother was found but stated that in March 2022, Father's mom flew Mother to California so that she could live with Father's sister, but Mother ran away from that location;

- Mother was found in April 2022 by a detective in California, and Father's mom then flew Mother back to Texas;

- after she returned to Texas, Mother ran away with Father;[13] and

- Mother was ultimately located in Houston in July 2022.[14]

Mother's service plan required her to take the following actions:

- obtain and maintain financial stability throughout the case and demonstrate an ability to meet the financial needs of her children, whether from a facility

---

[12]The Department placed Mother at two different shelters. In January 2022, Mother was placed at ACH Youth Shelter, but she was kicked out of the shelter for fighting on February 17, 2022. Mother was then placed at Jonathan's Place.

[13]Father was not listed as a runaway because he was an adult at this point. Stocks was not aware of when Father had returned but said that he had attended his parent–child visit on July 29, 2022.

[14]This testimony highlights Mother's housing instability, yet Mother makes the misleading statement in her brief that "the parents resided with [Father's mom] throughout the case."

14

that can provide for her and her children or from her own earnings/alternative income;

- acquire and maintain safe and stable housing throughout the case;

- attend and successfully complete the FOCUS for Mothers parenting education group sessions and provide a copy of completion to her caseworker;

- utilize community resources to find and maintain supportive relationships;

- contact Recovery Resource to complete a substance-abuse assessment to determine what services, if any, may be appropriate and follow all recommendations;

- work on forming positive relationships in order to develop a healthy support system that can encourage her to make positive and healthy decisions for herself and to be a positive support for her and her children;

- complete a mental-health assessment with MHMR and follow through with all recommendations;

- attend individual counseling until successfully discharged to develop coping skills for stressful situations, skills in interpersonal communication, and healthy parenting skills and to address the trauma she has experienced and sign a release of information authorizing an OCOK worker to obtain her progress notes;

- contact Traffick911 to set up case management with them and complete all recommended services; and

- work with her Unbound Underground advocate to understand and process the circumstances and events that lead to trafficking and to help process the trauma from such events, follow-up with any recommended services from her advocate, and sign a release of information authorizing an OCOK worker to obtain her progress notes.[15]

Stocks opined that Mother had not maintained safe and stable housing because she was living with Father and his mom. Stocks said that she had made an unannounced visit and found multiple vehicles at the home, even though Mother, Father, and Father's mom do not have driver's licenses.[16] Stocks did not want to enter the home due to concerns of sex trafficking and not knowing who was inside the home. Stocks called, and no one answered. Stocks returned another time when no cars were present and spoke with Mother, Father, and Father's mom in the driveway. Stocks did not enter the home on the second visit because as she was talking with Mother, Father, and Father's mom, a man named Mr. Ball came outside. Stocks explained that she was concerned for her safety because she did not know who

---

[15]The goals section of Mother's service plan stated that she would "have regular visits with her children," but the portion of the service plan that set forth various "Required Action[s]" never mentions attending visits.

[16]Mother, however, testified that Father's mom drives her to work.

16

all was inside the home and because she was concerned that sex trafficking was occurring in the home. Stocks only went inside the home once—in January 2023. She said that the home was suitable for adults but that there was nothing for toddlers.

Stocks said that working with the Unbound Underground/Traffick911 advocate was part of Mother's service plan due to her history and that the Department wanted Mother to learn skills to prevent her from being sex trafficked again. Stocks said that Mother was not successfully discharged from the program.

Mother's service plan required her to undergo a psychosocial assessment and to attend individual counseling, but Mother did not complete these tasks.[17] Stocks explained that Mother was willing to do the counseling but that Father's mom had instructed the counseling agency not to release reports and progress notes to OCOK. As a result, Stocks's supervisor said that they could not go forward with the counseling. When Stocks spoke with Mother and Father's mom in January 2023, Father's mom agreed that OCOK could obtain the notes from counseling, but from that time on, the counseling agency was unable to reach Mother. Stocks concluded that Mother was not compliant with her service plan.

Father's service plan required him to do the following: (1) acquire and maintain safe and stable housing throughout the case; (2) attend individual counseling until successfully discharged; (3) utilize community resources to find and maintain

---

[17]The record, however, contains a "Substance Abuse Evaluation and Biopsychosocial Assessment," but Stocks did not explain why this did not suffice to fulfill the psychosocial-assessment requirement.

supportive relationships; (4) attend and successfully complete the FOCUS for Fathers parenting-education group sessions and provide a copy of completion to the caseworker; (5) complete parenting classes; and (6) complete a life-skills course offered by his shelter. Stocks had the same concerns about Father's housing as she did with Mother's.[18] Similarly, neither Father nor Mother demonstrated that they were financially stable; both presented only one paystub for seasonal work in December 2022. Stocks had asked for more but had not received a response. Father did not complete the life-skills course at the shelter, or even attempt it, before he left the shelter.

In August 2022, Father's service plan was updated to add new tasks, including requiring him to call Family Pathfinders to set up financial coaching and to ask for a life-skills mentor,[19] to call 211 for additional supports as needed (because he lacked support other than from Mother and his mom), to undergo a mental-health assessment, to participate openly in a psychological evaluation at Merit Family Services, to demonstrate an ability to make autonomous decisions, to complete an assessment at Recovery Resource and follow all recommendations including inpatient or outpatient treatment, and to ensure that he is having regular medical appointments

[18]Stocks never received a copy of the lease for the home that Mother and Father lived in with Father's mom.

[19]When Stocks was asked whether the Department had had any luck communicating to Father how to find a life-skills mentor, she said, "No. . . . Because [his mother] talks for him."

as recommended by his provider.[20] According to Stocks, Father did not complete any of the newly added tasks.[21] Stocks concluded that Father did not successfully complete his services. On cross-examination, Stocks was asked to detail what Father had failed to do, and she responded, "Maintain safe and stable housing, . . . demonstrate the ability to meet the financial needs of his children, and utilize community resources to find and maintain support[ive] relationships. And also get a life[-]skills mentor and a mental[-]health assessment and follow all recommendations."

With regard to the parents' visits, Stocks noted that Father had attended a total of eight visits and was engaged in services when Mother was on runaway status; during that time, Father had resided at a separate shelter from his mom.[22] Stocks noted that due to Mother's runaway status, she had attended only six visits with her children—one of which was during the gap between the trial dates, despite that she was offered three visits during that time. Additionally, some of the visits were canceled because the parents did not confirm the visit an hour prior; this procedure was put in place due to their inconsistency in showing up for visits.

---

[20]The goals section of Father's updated service plan stated that he would "have regular visits with his children," but the portion of the service plan that set forth various "Required Action[s]" never mentions attending visits.

[21]On cross-examination, Stocks was asked whether Father's certificate for completing a program at Big Brothers Big Sisters of America would satisfy the life-skills mentor requirement, and she replied, "I'm not sure."

[22]Father lived at a shelter after he was released from jail.

Stocks monitored three of Mother's and Father's visits. Stocks said that it was concerning that Mother continued feeding Connor until he vomited, and then she fed him more after he had vomited. Stocks noted that Mother had excessively checked the children's diapers and that she had forced the children to kiss her on the mouth, even when Keith did not want that. Stocks said that Mother appeared overwhelmed. On one occasion, about twenty to thirty minutes into the two-hour visit, Mother laid on the couch and said, "This is a lot." Stocks noted that the parents did not bring any food, toys, or clothing for the children, despite that the visits were from 10:00 a.m. to noon.[23] Additionally, Father needed Mother to tell him what to do. On the positive side, Stocks said that the parents were attentive to the children.

Stocks said that throughout the case, it was difficult to tell with whom she was communicating because Mother and Father had used Father's mom's phone; Stocks believed that all communication was coming from Father's mom because Mother and Father would not communicate on their own without Father's mom's assistance. Stocks further explained that despite Father's being nineteen years old, both he and Mother are "extremely dependent" on Father's mom and that Father's mom "appears to be very controlling over them." When Stocks spoke to Father, he did not speak

---

[23]Stocks said that parents are asked to bring such items to show that they are financially capable of supporting their children. But on cross-examination, she admitted that the parents had not been told to bring toys or clothing and had not, to her knowledge, been told that Connor required prescription formula because he did not eat solid foods.

20

back; when Stocks spoke to Mother, she hesitated and looked at Father's mom for permission before answering.

Stocks was asked her opinion on Father's mom's involvement in this case with respect to the parents' success, and she described Father's mom's involvement as "detrimental." Stocks testified that she had asked Mother and Father if they had plans to move out of Father's mom's house;[24] Mother immediately said no, and Father said that they would talk about it. Stocks said that Father's mom was informed at a family conference with the Department and at her home visit in January 2023 that she was interfering with the Department's ability to reunite the children with their parents, but her behavior did not change. Instead, Father's mom continued to appear at permanency hearings, and she attended both trial dates.

Stocks testified that Father's mom had described herself as Father's mom and Mother's mother. Stocks said that Father's mom provided her with a legal guardianship document pertaining to Mother. The document was a power of attorney for caregiver of a child and had been executed by Mother's father.

Stocks summarized her reasons for concluding that Mother and Father had not addressed the concerns that had brought Keith and Connor into the Department's care as follows: Mother and Father continued to reside with Father's mom, despite

---

[24]On cross-examination, Stocks said that she had never told Mother that she was going to seek termination of Mother's parental rights if she did not separate herself from Father's mom but did inform Mother that it would be hard to place the children in her care if she continued living with Father's mom.

that the Department had found reason-to-believe for the abuse allegations against her involving Mother and Father; neither parent had maintained employment; neither parent had maintained a safe and stable house; and neither parent had demonstrated any learned behaviors from the services that were provided to them.

Stocks testified that she would be fearful if the trial court returned the children to Mother and Father because Connor has a diagnosis of failure to thrive and needs a lot of medical care. Stocks explained that Connor does not "eat solid foods. He doesn't crawl or walk, and he doesn't talk, so he would need ongoing . . . medical care. And he would need to be with someone who can determine if medical attention is needed at that moment." Stocks said that "as of right now, it's hard to determine exactly what he will need[ in the future], but he is severely delayed." As for Keith, Stocks said that he receives speech therapy as well as physical therapy and will "need parents [who are] able to safely provide for him and care for him." Stocks said that if the sex trafficking and mental-health issues are not addressed, it would be detrimental to the children if they were placed with their parents.

Stocks said that the children had been in the same foster home since the removal. Stocks testified that the foster parents have the ability to meet the children's medical needs. The foster home is not adoption motivated, but the foster parents are willing to be a long-term placement for the children. Stocks said that the Department

would continue to look for an adoption placement.[25] Stocks requested that the trial court terminate Mother's and Father's parental rights to Keith and Connor and appoint the Department as permanent managing conservator.

### 4. The Permanency Supervisor

Joanna Letz, who served as the permanency supervisor from the outset of the case until March 2023 when she left OCOK, testified that she had supervised both caseworkers (initially Ingraham and then Stocks). Letz said that they had several meetings with the family (Father's mom was not supposed to be present, but she kept interrupting the virtual meeting) during which it was made clear to the parents that reunification with their children would not be possible if they were living with Father's mom; this occurred when Ingraham was the caseworker. Letz explained to Mother and Father that OCOK needed them to demonstrate that they could "manage things," parent, and make decisions because as it stood Father's mom was "run[ning] the show." Whenever Mother was asked a question, she said that she would have to talk to Father's mom.

Letz was questioned about what efforts OCOK had made to help Mother find a stable living situation outside of Father's mom's home, and she explained how every time they had found a place for Mother, she had run away:

---

[25]The Department had been pursuing a relative placement with the children's paternal aunt in California, but after the first trial date, she said that she would no longer be willing to take the children because Father's mom had "threatened her life if she were to take the boys into her home."

23

Ingraham . . . worked with [Mother] a lot . . . .

[W]hen we would find [Mother], a lot of times [Ingraham] would pick her up. We would, you know, try to get her settled or meet with the advocate or they would hold her until we had a place. She had been to ACH. She had been to her father's house, and every . . . time we got her back and tried to get her somewhere stable, she would run away.

Q. Okay.

A. And then at one point, we were trying to work with her [sex-trafficking] advocate to get her somewhere safe, and -- [Father's mom] -- they ended up sending her out to California to [Father's sister's] house.

Q. And why did they do that?

A. I'm not real clear on why they did it, but they sent her to live out there. . . .

Q. Okay.

A. And then [Mother] ultimately ended up running from there. And -- and then it just -- it was just a cycle.

Q. Were you aware of when [Mother] returned to Texas to live with [Father's mom]?

A. Yes.

Q. Was that sanctioned by OCOK?

A. No.

Q. Was that made clear to [Mother]?

A. Yes.

Letz explained that, against OCOK's instructions, the Dallas CPS had dropped

off Mother at Father's mom's house after Mother had been found in Houston. When

24

asked if she thought that the Department could have done anything else with respect to placing Mother anywhere outside of Father's mom's home, Letz responded, "I do not. She would not have stayed."

Letz opined that the foster placement was safe and appropriate for the children. Letz testified that Father's mom was not considered an appropriate placement for the children due to her prior CPS history.

### 5. The Court-Appointed Special Advocate (CASA) Volunteer

The children's CASA volunteer, who was also a preschool teacher, testified that during the first visit that she had observed between the children and Mother, she had noticed that Connor had a large bump on his head and was twitching and that Keith had emotional disturbances that were outside the bounds of normal tantrums—when he was upset, he pulled hard on his nipples and his genitals. The CASA volunteer stated that, based on her training and expertise, Keith's actions led her to believe that he had been sexually abused. Keith also walked with a side-to-side shuffle and had a lack of flexibility; similarly, Connor's body exhibited "a lot of tenseness."

While the case was pending, Connor had turned one and had slowly learned to army crawl but was not cruising or crawling with all four limbs independently moving on the ground and had exhibited feeding issues, as demonstrated by "a tendency to spit up, throw up, a lot of what he [ate]." The CASA volunteer noted that a month and a half before the second trial date, Connor had taken "his first bite of . . .

something other than toddler formula or milk." Connor had been diagnosed with low muscle tone and "either the swallowing problem or a stomach[-] issue diagnosis."

Keith had progressed emotionally from pulling on his genitals when he was angry to responding with "okay" or listening or simply crying for a few moments before moving on to regular toddler behavior. Keith had progressed physically by being able to step up on things, to lead with one foot over the other, and to walk over uneven surfaces despite having a previous fear of walking on things such as grass or outside pavement.

The CASA volunteer stated that during the visits, Father played with the boys, talked to them, and was very happy with them.[26] However, there was a visit at McDonald's where it was discussed that Father could move to his sister's home in California and raise the boys with her help, and Father "was very resistant." The CASA volunteer noted that after that visit, Father started speaking less (he instructed others to answer for him) and seemed apathetic.

When the CASA volunteer observed Mother's visit with the children in November or December 2022, Mother seemed very excited to see the boys and was very affectionate towards them. The most recent visit occurred the Friday before the second trial date and was with Mother, Father, and Keith; Connor was sick that day. The CASA volunteer noted that Mother was excited to see Keith and showed a lot of

---

[26]The CASA volunteer's report to the court dated August 25, 2022, stated that at the July 29, 2022 visit, Father had put caffeinated tea in Keith's sippy cup and had to be redirected and that Father was on his phone the majority of the visit.

affection. Mother tried to hold Keith the majority of the time and patted his bottom "quite hard," and Keith (who was three) was frustrated and fussed and whined about that. Mother told Keith, "Oh, go see your father." After Keith went to Father, Mother said, "Come back. . . . [W]hy are you doing me like that?" The CASA volunteer noticed that it caused Keith a lot of stress. Additionally, while Mother was holding Keith, he pointed to her shirt that had a cartoon character on it, and Mother placed his hands on her breast and asked him if he wanted to nurse; the CASA volunteer testified, "[T]hat is inappropriate for that age." She explained that it was inappropriate because Keith was no longer nursing, because he "already has a fixation with his genitals and his chest," and because "it's just not appropriate due to age or due to context and circumstance." After that, there was a lot of kissing on the face; Mother persistently told Keith, "Give me a kiss. Give me a kiss," and Keith responded with a "lot of resistance" and whining because he wanted to walk and play.

The CASA volunteer opined that the issues that brought the children into care had not been resolved—the parents were living with Father's mom and had not completed services—and the children therefore should not be returned to their parents. When the CASA volunteer was asked what other concerns she had about the parents caring for the children, she said that "the hands on the breast" incident posed a concern "given the context of the signs that [she had] seen from [Keith] being of a sexual nature" and that she and the foster mother had both raised concerns that Keith may have been sexually abused. The CASA volunteer also did not believe that the

27

children should be placed with Father's mom because based on behaviors that she had seen in the parent–child visits and in the family meetings, she did not believe that Father's mom's home was a healthy place for the boys to stay.

The CASA volunteer did not have any concerns about the foster placement and opined that the foster parents were meeting the children's emotional and physical needs.

### 6. Mother (During Her Case in Chief)

When Mother was called as part of her case in chief, she presented a copy of the lease for the house where she lived with Father and Father's mom and said that it was emailed to Stocks more than once. Mother did not bring copies of the emails showing that she had sent the lease to Stocks.

Mother testified that she did not receive responses when she emailed Stocks throughout the case requesting cab vouchers. Mother testified that her visits were canceled six or seven times and that she had only learned that after she had arrived at the visitation location. Mother did not know until October 2022 that she needed to arrive an hour prior to the visit. Mother testified that she had attended ten visits; Mother later clarified that of the ten, she did not see her children two or three times because she had learned after she had arrived that the visits had been canceled.

### 7. Father (During His Case in Chief)

Father testified that he began dating Mother in summer 2018; he agreed that based on her birthday, she would have been thirteen years old at that time. Father

said that he and Mother began having sex when she "was at least [fifteen]," but Father agreed that Keith was conceived in early 2019, which was while Mother was still thirteen years old.

Father admitted that prior to this case's inception, he had been arrested for mail theft. Father explained that he had taken a package from someone's porch because he wanted to get his son Hot Wheels for Christmas. Father believed that he had only done that "[a]t least once," but he later testified that it had been "at least, like, three times."

While he was on probation and staying at a shelter in October 2021, Father called the police. When asked what he had told the police in his phone call, Father said that he had told them that Mother used to be a runaway because he was upset with her over "some stupid stuff" and that he "was young and dumb." Father agreed that he had concerns that Mother was not supposed to be around him while he was on probation, but he could not remember why he had thought that he would get in trouble for being around Mother while he was on probation. He said that he wanted to get Mother away from him so that she did not see him having seizures or see him going to jail. As mentioned above, Father's call resulted in his arrest on outstanding warrants related to probation violations.

Father did not know why his children had come into the Department's care. He recalled having two seizures[27] in jail after his arrest and a man handing him paperwork to sign. Father said that he cannot read after having a seizure, so he had signed the papers without knowing what they said. Father did not believe that he was to blame for his children's coming into the Department's care and said that he was "mad that the police [had taken his] kids away from [him] because no one would[] pick them up because all [his] family is in California."

Father testified that he enjoys visiting with his children and would like to have them back in his care. Father opined that he could care for his children and could provide for them financially.

Father explained that he had just started a job with Amazon eight days before the second trial date and was making $42 per hour. Father was unsure what benefits he would have with his job. Prior to starting with Amazon in April 2023, he had not worked since December 2022 when he did seasonal work. Father did not know the amount of his monthly rent because his mom helped him with that.

When asked what his plan for childcare would be while he is at work, Father responded, "[T]o be honest, I'm just going to help my kids and show them I'm a better father." When asked again about his plan for childcare, Father said that his plan was to get out of Texas and to move on with his life, that he had not looked into

[27]Father mentioned that he has severe epilepsy, which prevents him from obtaining a driver's license, causes him to forget things, and for which he takes Depakote.

a babysitter, and that he would not do so until he started trusting people again. Father said that his mom and Mother are the only people he trusts to care for his children.

### 8. Outcome

At the conclusion of the second day of trial, the trial court took the matter under advisement. The trial court sent the parties a letter with its rendition and later signed an order terminating Mother's and Father's parental rights to Keith and Connor based on clear and convincing evidence of three predicate grounds— endangering environment, endangering conduct, and failure to comply with their court-ordered service plans—and the best-interest ground. The trial court also found by clear and convincing evidence that Father,

> [a]fter being served with citation, did not timely file an admission of paternity or a counterclaim for paternity under Chapter 160, Texas Family Code or that the child was under one year of age at the time the petition for termination of the parent[–]child relationship was filed and the alleged father has not registered with the paternity registry pursuant to Chapter 160, Texas Family Code[]

and "that termination of the parent–child relationship, if any exists or could exist, between the alleged father [**FATHER**] and [**CONNOR**] . . . is in the best interest of the child."[28]

---

[28]Because the paternity ground was not included in the trial court's April 20, 2023 rendition letter and because the letter mentioned terminating only "the parent[–] child relationship between the child and the Father," rather than the *children* and Father, we abated the appeal and remanded the case for the trial court to clarify its letter ruling/rendition. We have received a supplemental clerk's record with a letter from the trial court, clarifying that it terminated Father's parental rights as to both children and that it terminated Father's parental rights to Connor based on Section

### III. Burden of Proof and Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the

161.002 (failure to file with the paternity registry), as well as on Section 161.001(b)(1)(D), (E), and (O). With the letter ruling/rendition clarified, the trial court noted that the May 18, 2023 termination order "accurately reflects the [trial c]ourt's ruling after considering this clarification." The trial court signed a corrected termination order, but it did not change the terms of the prior termination order.

finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother's and Father's conduct endangered the children[29] and that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)(E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

---

[29]Subsection (M) allows a trial court to terminate the parental rights of a parent whose parent–child relationship with another child was terminated based on an endangerment finding under (D) or (E) (or an out-of-state-equivalent). Tex. Fam. Code Ann. § 161.001(b)(1)(M); *see id.* § 161.001(b)(1)(D), (E). Thus, when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (relying on *N.G.* and holding same).

## IV. Law Applicable to Both Appeals

### A. The Law on Termination Based on Failure to Comply with Court-Ordered Services

A trial court may order termination of the parent–child relationship if it finds the following by clear and convincing evidence:  (1) the child was removed under Chapter 262 from the parent due to abuse or neglect; (2) the child was "in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result"; (3) a court order "specifically established the actions necessary for the parent to obtain the return of the child"; and (4) the parent failed to comply with the provisions of the court order. Tex. Fam. Code Ann. § 161.001(b)(1)(O).  Ground (O)

> does not quantify any particular number of provisions of the family service plan that a parent must not achieve in order for the parental rights to be terminated or the degree of a parent's conduct that will be deemed to be a failure to achieve a particular requirement of the plan.

*In re B.H.R.*, 535 S.W.3d 114, 122 (Tex. App.—Texarkana 2017, no pet.).

A defense to termination under Subsection (O) is provided in Texas Family Code Section 161.001(d), which states that

> [a] court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that[]
>
> > (1) the parent was unable to comply with specific provisions of the court order; and

34

(2) the parent made a good[-]faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

Tex. Fam. Code Ann. § 161.001(d). Section 161.001(d) places the burden on the parent to prove by a preponderance of the evidence that he or she was unable to comply with the court-ordered service plan, that he or she made a good-faith effort to comply with the order, and that his or her failure to comply is not attributable to any fault of the parent. *In re L.E.R.*, 650 S.W.3d 771, 788 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

## B.     The Law on Conduct-Based Endangerment

Subsection (E) requires a finding that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(E). To "'endanger' means to expose to loss or injury[,] to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, evidence of endangerment under Subsection (E) "is not limited to actions directed towards the

35

child," *In re J.F.-G.*, 627 S.W.3d 304, 315 n.43 (Tex. 2021) (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.).

> As we have previously noted,
>
> As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See* [*In re*] *S.D.*, 980 S.W.2d [758,] 763[ (Tex. App.—San Antonio 1998, pet. denied)]. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

*In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.). We catalog some of the types of conduct that we can consider in an endangering-conduct analysis:

- "A parent's mental health is frequently considered in reviewing the sufficiency of the evidence under endangerment grounds." *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied).

- Additionally, endangering conduct includes intentional criminal activity because such activity exposes a parent to incarceration. *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc op. on reh'g). *See generally In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex.

App.—Houston [1st Dist.] 2013, no pet.) (considering dismissed criminal charges when assessing sufficiency of evidence supporting termination under Section 161.001(b)(1)(E)). However, even though a parent's criminal history and imprisonment are factors when considering endangering conduct, a conviction or sentence of incarceration, standing alone, will not support termination under Subsection (E). *J.F.-G.*, 627 S.W.3d at 312–15.

- Also as part of the endangering-conduct analysis, a court may consider a parent's failure to complete a service plan. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.).

- Furthermore, a parent's lack of significant contact with a child may also endanger the child's physical or emotional well-being. *In re A.J.D.*, No. 02-13-00183-CV, 2013 WL 5781478, at *4 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.).

## C. The Law on Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be

the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

> (A)    the [child's] desires . . . ;
>
> (B)    the [child's] emotional and physical needs[,] . . . now and in the future;
>
> (C)    the emotional and physical danger to the child now and in the future;
>
> (D)    the parental abilities of the individuals seeking custody;
>
> (E)    the programs available to assist these individuals to promote the [child's] best interest . . . ;
>
> (F)    the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;
>
> (G)    the stability of the home or proposed placement;
>
> (H)    the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and
>
> (I)    any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that

termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## V. Mother's Appeal

In her fourth, second, and fifth issues, respectively, Mother argues that the evidence is legally and factually insufficient to support the finding that she failed to complete her court-ordered services, the endangering-conduct finding, and the best-interest finding. Because the record contains legally and factually sufficient evidence to support each of these challenged grounds, we decide against Mother on these issues.

### A. Sufficient Evidence of Failure to Comply with Court-Ordered Services

In her fourth issue, Mother argues that the evidence is legally and factually insufficient to support the finding under Subsection (O)—her failure to comply with her court-ordered service plan. We begin by addressing this ground because it can be used as part of the endangering-conduct and best-interest analyses.

Although Mother contends that "she completed every service that she could," the record demonstrates that Mother failed to complete multiple tasks on her service plan. For one, Mother was required to demonstrate financial stability throughout the case but presented only one paystub. Second, Mother was also required to maintain safe, stable housing throughout the case but failed to do so; during the first nine months while the case was pending, Mother was often on runaway status, and in the

latter nine months, Mother lived in the home with Father and his mom—both of whom had abused her. Mother, thus, failed to maintain safe, stable housing throughout the case.[30] *See, e.g.*, *A.C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied) (noting that factfinder could have reasonably inferred that recent positive changes were "too late in the case to demonstrate that [the parent] could provide the child with the long-term safety and stability that the child would need over the course of her childhood"). Third, the testimony was controverted on whether Mother was successfully discharged from Unbound Underground, and the trial court as the factfinder was entitled to believe the caseworker's testimony that Mother was not successfully discharged and thus did not complete that task on her service plan. Further, the record is undisputed that Mother did not attend any individual counseling sessions. Mother claims that she wanted to engage in individual counseling but never received a response to her request to engage her own counselor. The record demonstrates that two months before trial when Father's mom finally gave approval for the Department to receive notes from counseling sessions (which appears to have been a prerequisite to starting the

---

[30]Mother argues that Stocks never informed her that it would be an issue if Mother continued to live with Father's mom; the record, however, demonstrates that the first caseworker Ingraham had multiple conversations with Mother about this. Mother also complains that the Department placed her with Father's mom upon her return from Houston. The testimony revealed that Dallas CPS took that action against local CPS's wishes. Nevertheless, neither of Mother's arguments counter the fact that she failed to maintain any housing stability for the first nine months of the case.

sessions), the counselor was unable to reach Mother. Mother has not met the requirements of Section 161.001(d) to prove by a preponderance of the evidence that she was unable to comply with the court-ordered service plan, that she made a good-faith effort to comply with the order, and that her failure to comply was not attributable to any fault of her own. *See* Tex. Fam. Code Ann. § 161.001(d); *In re N.L.S.*, No. 04-23-00251-CV, 2023 WL 4338949, at *6 (Tex. App.—San Antonio July 5, 2023, no pet.) (mem. op.).

Based on Mother's multiple failures, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother failed to comply with her court-ordered services. Accordingly, we overrule Mother's fourth issue.

### B. Sufficient Evidence of Endangering Conduct

Regarding Mother's sufficiency challenges to the endangering-conduct finding, this case began with a referral that Mother had been seen spanking Connor (who was not even one month old) and telling him to shut up. The investigation revealed that Mother had run away from home with no supplies to care for Connor. Meanwhile, Keith was living with Father and his mom in California, despite that Father had a reason-to-believe disposition for sexually abusing Mother and that his mom had reason-to-believe dispositions for neglectful supervision, physical abuse, and sexual abuse of Mother, as well as reason-to-believe dispositions for medical neglect and neglectful supervision of Father. More than two weeks elapsed before the Department received word that Mother had been at a shelter, where she had left both

41

of her children in the care of Father and his mom, who were both ultimately arrested—Father for a probation violation and his mom for harboring a runaway. From October 2021 to July 2022, Mother ran away multiple times. Yet, each time she returned to the DFW area, she went back to living with her abusers despite the Department's attempts to place her in various shelters.[31]

The record contains the prior CPS history in which Mother had accused Father and his mom of promising her a house in exchange for having babies, and there were concerns that Mother was being sex trafficked. At trial, Mother denied having been

---

[31]Mother's argument regarding insufficient evidence of endangering conduct consists of two paragraphs; we address the first paragraph here. Mother argues that

> the Department wholly failed to show the danger that [Mother's] environment [sic] presented for the child and how [Mother] disregarded that danger. [T]he Department's focus [was] on [Father's mom] and how she was too involved in the case and in [Mother's] life; however, the Department did not seek to open a legal case to remove [Mother] from [Father's mom]. [Mother] testified that she felt safe with [Father's mom]. Further, the Department placed [Mother] back with [Father's mom] and then sa[id] that she [could not] reside with [Father's mom].

Mother attempts to have us evaluate the Department's conduct rather than her own. We decline to do so because, as set forth above in the standard of review, that is not the lens through which we evaluate the propriety of a termination order. Moreover, Mother completely omits the evidence of her suicidal ideations and fails to acknowledge the numerous times that she ran away during the case; suicidal ideations and running away constitute evidence of endangering conduct toward her children. Furthermore, Mother also ignores the testimony from the supervisor who testified that (1) OCOK did not authorize Mother to be placed with Father's mom after she was found in Houston but that Dallas CPS had done that against OCOK's wishes, and (2) Ingraham had made attempts to place Mother with her father and at shelters though such attempts were futile because Mother had fled each place and had returned to Father's mom.

forced to do anything and described Father's mom's home as the safest place for her. On appeal, Mother concedes in the second paragraph of her two-paragraph analysis that she "had a history of being sex trafficked" and argues that her "statements to her prior caseworker make[] it clear that she did not have a choice and was not in control of [Keith's] being with [Father's mom]." Mother's argument, however, omits any mention of her conduct in fleeing her mother's home with Connor and ultimately leaving him with Father and his mom at a shelter. Nor does she attempt to explain why she felt safe with Father's mom despite the abuse perpetrated on her by Father and his mom and despite being offered other shelters to live in.[32]

The record also raised concerns regarding Mother's mental health. Upon returning to high school after Connor's birth, Mother expressed suicidal ideations on

_____

[32]The San Antonio Court of Appeals dealt with a similar scenario and held that the mother's conduct in remaining with sex traffickers endangered her children:

> Jenna [the mother] argues [that] she was protective of the children and did not endanger them and proved this by reporting her sexual assaults and sex trafficking to law enforcement. However, Jenna did not remove the children from this endangering environment; the Department did. And Jenna decided to remain in that same environment for a full year after the children's removal. During that time, she made additional reports of sexual assault and sex trafficking and was subjected to forced drug use. Jenna's conduct posed a dangerous risk to the children's physical and emotional well-being by remaining in an endangering environment. Jenna's decision to remain in this environment until October 2020—a year after the children were removed—was a voluntary, deliberate, and conscious course of conduct[,] and we may infer danger to the children from it.

*In re J.K.N.G.*, No. 04-21-00310-CV, 2022 WL 689095, at *6 (Tex. App.—San Antonio Mar. 9, 2022, pet. denied) (mem. op.).

her school computer. Yet, Mother did not participate in counseling to alleviate the Department's concerns regarding her mental health.

Furthermore, in addition to not fulfilling the counseling requirement on her service plan, Mother participated in only six visits with her children, was not successfully discharged from the sex-trafficking programs, and had not maintained employment or stable housing. Mother thus had not completed the tasks on her service plan, which is a consideration when evaluating the endangering-conduct ground. *See R.F.*, 115 S.W.3d at 811.

On this record, a reasonable factfinder—whether viewing the evidence in the light most favorable to the judgment or weighing all of the disputed evidence, *see A.C.*, 560 S.W.3d at 630–31—could have formed a firm belief or conviction that Mother's course of conduct endangered the children's well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.K.N.G.*, 2022 WL 689095, at *6. Accordingly, we overrule Mother's second issue challenging the endangering-conduct ground in Subsection (E).

### C. Challenges to Other Predicate Grounds

Mother's first issue challenges the legal and factual sufficiency of the evidence to support the Subsection (D)—endangering environment—finding. Because an appellate court may uphold one endangerment finding under Subsection (D) or (E), without addressing the other, even in cases where both findings are challenged on appeal, we need not address Mother's first issue. *See J.B.M.H. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin

44

Apr. 13, 2023, pets. denied) (mem. op.) (affirming endangerment finding under Subsection (D) without addressing challenge to finding under Subsection (E) because "collateral consequences [under future Subsection (M) termination] are identical" whether based on finding under Subsection (D), (E), or both); *see also* Tex. R. App. P. 47.1.

In her third issue, Mother challenges Subsection (N)—constructive abandonment—even though the trial court did not terminate based on that predicate ground. Accordingly, we overrule Mother's third issue.

### D. Sufficient Evidence of Best Interest

As to Mother's fifth issue challenging the sufficiency of the evidence to support the best-interest finding, we begin our analysis with the first factor—the children's desires. At the time of the termination trial, Keith was three years old, and Connor was one and a half years old; thus, they did not testify at trial.[33] "When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are [well cared] for by them, and have spent minimal time with a parent." *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The record reflects that the boys are in the same foster home and are "able to form bonds with [their] current caregivers." Moreover,

---

[33]Mother contends that "[t]here was no evidence presented that the children do not want to be with their mother or that they want to remain in limbo without having permanency." The fact is that the children were too young to express their desires and did not testify.

45

the CASA volunteer did not have any concerns about the foster placement and opined that the foster parents, who were willing to be a long-term placement for the children and whom the children had lived with since the removal in 2021, were meeting the children's emotional and physical needs. The record further reflects that the children were removed from Mother's care when Keith was approximately one and a half and Connor was one month old and that Mother had not spent a significant amount of time with them.[34] The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Keith and Connor.

Regarding the children's emotional and physical needs now and in the future, the record demonstrates that Connor requires prescription formula, has a failure-to-thrive diagnosis, and is severely delayed (e.g., does not crawl or walk, does not talk, and does not eat solids) such that he requires ongoing medical care—the future extent of which is unknown—and "need[s] to be with someone who can determine if medical attention is needed at that moment." Keith receives speech therapy as well as physical therapy and will "need parents [who are] able to safely provide for him and care for him." Mother argues that "the Department did not include either parent in the children's therapy, did not educate [the parents] on the child[ren]'s developmental needs, and did not educate the parents on [Connor's] special formula requirements." Mother does not argue that she requested to be included or educated on these items,

---

[34]Mother argues that "[t]he only testimony presented regarding this [factor] is that [Mother] was very excited to see her children and was affectionate toward them." This factor, however, focuses on the children's desires, not Mother's.

nor does she argue how she would be able to meet the children's special physical needs. Mother further argues that because her visits went well, she would be able to provide for her children's emotional needs. Mother, however, ignores the hands-on-the-breast incident and never adjusted her behavior when Keith did not want her to repeatedly kiss him; plus, she ignores that she had attended very few visits and had been absent the bulk of her children's lives, thus requiring someone else to provide for their emotional and physical needs. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Keith and Connor.

The emotional and physical danger to the children now and in the future included being left with Father's mom and Father because Mother had expressed suicidal ideations and had a pattern of being a runaway and leaving her children with those two individuals even though they both had reason-to-believe dispositions for allegations involving their treatment of Mother and Father's mom had additional reason-to-believe dispositions for medical neglect and neglectful supervision of Father. Stocks opined that if the sex-trafficking and mental-health issues were not addressed, then it would be detrimental to the children if they were placed with their parents. And as noted above, Mother had not addressed those issues. There were also allegations of food insecurity and medical neglect of Keith when he lived with Father's mom and Father. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Keith and Connor.

As for Mother's parenting abilities and her acts or omissions that demonstrate that the existing parent–child relationship is not a proper one, the prior two factors detail Mother's acts and omissions and demonstrate that Mother lacks the parenting skills, including being present and autonomous decision-making, that are necessary to care for the children's medical needs. Additionally, she attended only six visits, was overwhelmed during one of the visits, and was inappropriate with Keith at the most recent visit. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Keith and Connor.

Regarding the programs available to assist Mother to promote the children's best interest, the record demonstrates that Mother did not complete the services on her plan, including the programs available to address her mental-health issues and sex trafficking. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Keith and Connor.

The Department's plan for the children up until the second trial date was for the children to live with Father's sister in California, but she removed herself from consideration after being threatened by her mother (Father's mom). The Department then altered its plan, requesting the trial court to allow the children to stay in their current long-term foster placement while the Department continues to search for a placement that is adoption motivated. If the children were returned to Mother, she planned to have them live with her at Father's mom's home and watch them while

Father and his mom worked. The trial court was entitled to find that this factor was neutral.

As for the stability of the proposed home or placement, the children had been with the same foster parents throughout the duration of the case (since October 2021). Mother, however, had only been living in the same home since July 2022 when she returned from being a runaway, and that home was unsafe due to Father's mom's presence in the home. The trial court was entitled to find that this factor weighed in favor of termination.

Mother's excuses included that she had been kidnapped, that she had not been included in her children's therapy, that the Department had canceled visits without explanation, that she had not been educated about the children's special developmental needs, and that living with Father's mom was appropriate because the Dallas CPS had returned her there. Mother argues that the Department seemed to care about her prior to when she gave birth to Keith, but after his birth, "the focus was not on how to help her succeed in motherhood." Mother further argues that she "has experienced trauma and likely sex trafficking, but the Department does not focus on how to help her with that." Mother's argument ignores that the final best-interest factor is not on the Department's acts or omissions but on the parent's. The trial court was entitled to find that this factor was neutral.

Considering the entire record and applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's

finding that termination of Mother's parental rights to Keith and Connor was in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's best-interest finding when most of the best-interest factors weighed in favor of termination); *Smith v. Tex. Dep't of Protective & Regul. Servs.*, 160 S.W.3d 673, 683 (Tex. App.—Austin 2005, no pet.) (holding evidence legally and factually sufficient to support best-interest finding when evidence showed that mother failed to cooperate with the Department in order to comply with her court order; that she was completely dependent on her parents, with whom she had an unstable, violent relationship; and that she routinely ran away when confronted with problems). Accordingly, we overrule Mother's fifth issue.

## VI. Father's Appeal

In his first issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding terminating his parental rights, if any, as an alleged father to Connor under Texas Family Code Section 161.002(b). In his fourth, third, and fifth issues, respectively, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that he failed to complete the services on his court-ordered service plan, the endangering-conduct finding, and the best-interest finding. Although we hold in Father's favor on his first issue regarding the finding under Section 161.002(b), because the record contains legally and factually sufficient evidence to support the findings under Section

50

161.001(b)(1)(O), (b)(1)(E), and (b)(2), we uphold the corrected termination order as to Father.

## A.     Termination Under Section 161.002(b) Was Improper

In his first issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding terminating his parental rights, if any, as an alleged father to Connor under Texas Family Code Section 161.002 for failing to file an admission of paternity or register with the Paternity Registry.  The Department concedes that the evidence is insufficient to terminate Father's parental rights to Connor under Section 161.002(b).  We agree and hold that the Department was required to prove termination on Section 161.001(b) grounds.

The Dallas Court of Appeals has recently summarized the law on terminating an alleged father's parental rights:

> Under the Texas Family Code, "The procedural and substantive standards for termination of parental rights apply to the termination of the rights of an alleged biological father." Tex. Fam. Code [Ann.] § 161.002(a).  While [S]ubsection (b)(1) allows the Department to summarily terminate the rights of an alleged biological father who does not assert his paternity, an alleged biological father's admission of paternity "gives him the right to proceed to trial and require the [S]tate to prove by clear and convincing evidence that he engaged in one of the types of conduct listed" in [S]ection 161.001(b)(1) and "that termination is in the best interest of his child." *Phillips v. Tex. Dep't of Protective & Regul. Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.); *see In re Z.A.*, No. 05-21-00126-CV, 2021 WL 3477713, [at] *6 (Tex. App.— Dallas Aug. 6, 2021, no pet.) (mem. op.) (quoting *Phillips*, stating, "an alleged father who admits paternity can 'stave off summary termination of his rights [under [S]ection 161.002(b)(1)] and require[] the Department to meet the high burden of proof found in [S]ection 161.001.'").

51

*In re Z.E.*, No. 05-22-01337-CV, 2023 WL 3595627, at *4 (Tex. App.—Dallas May 23, 2023, pet. denied) (mem. op.). Moreover, the manner and means of admitting paternity is not restricted to the filing of an Acknowledgment of Paternity or a pleading claiming paternity but may be established in various ways. *In re E.G.P.*, No. 09-22-00330-CV, 2023 WL 4013306, at *9 (Tex. App.—Beaumont June 15, 2023, no pet.) (mem. op. on reh'g).

Here, Father filed a "Request For Counsel/Affidavit Of Indigence" stating, "I, [Father], am a parent of the child/ren named above." Father also appeared and testified at trial. Although he was not directly asked if he was the father of both Keith and Connor, he testified to his memory issues and stated, "I don't remember my own sons' names sometimes." He was also asked about his visits and having his children returned to him:

> Q. (BY [FATHER'S ATTORNEY]) [Father], do you enjoy visiting with your children?
>
> A. Of course, I do.
>
> Q. Okay. And would you like to have your children back in your care?
>
> A. Of course, I do.
>
> Q. Do you believe that you can care for your children?
>
> A. Of course, I do.

52

Throughout his questioning, Father did not ever deny that he was Connor's father or state that he was solely Keith's father.

Based on this evidence, we conclude that Father triggered his right to require the Department to prove one of the predicate grounds under Section 161.001(b)(1) and the (b)(2) best-interest ground. *See In re J.L.A.*, No. 04-13-00857-CV, 2014 WL 1831097, at *2 (Tex. App.—San Antonio May 7, 2014, no pet.) (mem. op.) (noting that "by . . . appearing at trial and admitting that he is the child's father, an alleged father triggers his right to require the Department to prove one of the grounds for termination under [S]ection 161.001(1) and that termination is in the best interest of the child"); *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 105 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that when alleged father did not file document claiming paternity but appeared at trial to assert paternity and oppose termination of rights, trial court could not terminate rights under 161.002(b)). Accordingly, we sustain Father's first issue. As noted in the background section, the trial court also terminated Father's parental rights to Connor based on Section 161.001(b)(1), (2). *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We therefore proceed to analyze the sufficiency of the evidence to support the Section 161.001(b) grounds terminating Father's parental rights to both Keith and Connor.

**B.** **Sufficient Evidence of Failure to Comply with Court-Ordered Services**

Although Father argues in his fourth issue that the evidence at trial supported that he had complied with the provisions of the trial court's order and the requirements of his family service plan, Stocks's testimony demonstrates otherwise. Stocks testified that Father had failed to complete the following services: "[m]aintain safe and stable housing, . . . demonstrate the ability to meet the financial needs of his children, and utilize community resources to find and maintain support[ive] relationships. And also get a life[-]skills mentor and a mental[-]health assessment and follow all recommendations." Although Father may have lived in the same house after leaving the shelter (which was after he was released from jail)—the date of which is not specified in the record—that home was not safe because his mom lived there. Father argues that the Department "failed to identify what was unsafe or inappropriate about the home," but it was clear that Father's mom's presence in the home was the issue due to her reason-to-believe dispositions for abuse and neglect of Father and Mother. Father also contends that he was verifiably employed during the case and had secured a new job at the time of the termination trial in order to maintain financial stability, but he provided only one paystub to his caseworker, evidencing his seasonal job during December. The record demonstrates that Father trusted only his mom and Mother and had no other support system. Although the evidence was controverted on whether Father had obtained a life-skills mentor and

54

had undergone a mental-health assessment and followed all the recommendations, the trial court was also entitled to believe the caseworker's testimony over Father's testimony.

Based on Father's failure to complete multiple tasks on his service plan, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Father failed to comply with his court-ordered services. Accordingly, we overrule Father's fourth issue.

## C.    Sufficient Evidence of Endangering Conduct

In his brief, Father attempts to minimize his criminal conduct, to play up his supportive relationship with Mother, and to ignore his mom's past abuse and neglect. The record, however, demonstrates that Father admitted at trial that he had stolen packages off porches at least three times; this constitutes evidence of repeated criminal conduct for which he was placed on probation. Father was arrested for a probation violation and was taken to jail at the outset of the case, leaving the children with his mom, who was later arrested for harboring a child other than Mother as a runaway. Moreover, although Father argues that he and Mother "supported and trusted each other" and "were still engaged in a relationship," this does not negate the fact that Father had a reason-to-believe disposition for sexually abusing Mother by impregnating her when she was thirteen years old and again when she was fifteen years old. Father contends that "[t]he Department's case was largely based on [its] speculative belief that paternal grandmother was overly involved in the case and

55

controlling over Father and Mother[] yet still failed to [show] how this endangered the children's physical or emotional well-being." The record reflects that the Department put on evidence of food insecurity when Keith lived with Father's mom in addition to Father's mom's multiple reason-to-believe dispositions (including sexual abuse, physical abuse, and neglectful supervision of Mother, as well as medical neglect and neglectful supervision of Father). The Department also put on evidence that Father's mom, along with Father, had lured Mother into having babies and that Father's mom had played a role in sex trafficking Mother. Even though Father had been a direct target of his mom's abuse and neglect, he exposed the children to her, continued living with her, and wanted to raise the children in her home. Because a factfinder may infer from past endangering conduct that similar conduct will recur, there was every indication that Father's mom would continue to be a danger to Father and Mother, as well as the children.

A reasonable factfinder—whether viewing the evidence in the light most favorable to the judgment or weighing all of the disputed evidence—could have formed a firm belief or conviction that Father's course of conduct endangered the children's well-being. *See id.* § 161.001(b)(1)(E); *In re L.D.F.*, No. 04-15-00399-CV, 2015 WL 8390969, at *4 (Tex. App.—San Antonio Dec. 9, 2015, no pet.) (mem. op.).

Accordingly, we overrule Father's third issue challenging the endangering-conduct ground in Subsection (E).[35]

### D. Sufficient Evidence of Best Interest

Regarding the first best-interest factor—the children's desires—the analysis is much the same as that we performed in Mother's appeal. At the time of the termination trial, Keith was three years old, and Connor was one and a half years old; thus, they did not testify at trial. "When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are [well cared] for by them, and have spent minimal time with a parent." *S.R.*, 452 S.W.3d at 369. The record reflects that the boys are in the same foster home and are "able to form bonds with [their] current caregivers." Moreover, the CASA volunteer did not have any concerns about the foster placement and opined that the foster parents, who were willing to be a long-term placement for the children and whom the children had lived with since the removal, were meeting the children's emotional and physical needs. The record further reflects that the children were removed from Father's care when Keith was approximately one and a half and Connor was one month old and that Father had not spent a significant amount of time with them. Father argues that the children's "happy, positive interactions with

---

[35]Because an appellate court may uphold one endangerment finding under Subsection (D) or (E), without addressing the other, even in cases where both findings are challenged on appeal, we need not address Father's second issue. *See J.B.M.H.*, 2023 WL 2920315, at *8; *see also* Tex. R. App. P. 47.1.

57

Father would support that they desired a relationship with him" and that the Department presented no evidence that the children did not want to see or engage with him, but eight visits is not determinative of their desires, nor were they of age to express their future desires. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Keith and Connor.

Regarding the children's emotional and physical needs now and in the future, the record demonstrates that Connor has a failure-to-thrive diagnosis and is severely delayed (e.g., does not crawl or walk, does not talk, and does not eat solids) such that he requires ongoing medical care—the future extent of which is unknown and "need[s] to be with someone who can determine if medical attention is needed at that moment." Keith receives speech therapy as well as physical therapy and will "need parents [who are] able to safely provide for him and care for him." Similar to Mother, Father argues that the Department failed to provide evidence showing that Father was incapable of meeting Connor's needs and did not include either parent "in medical training for the child." Father contends that his completion of the FOCUS classes shows that he was able and willing to engage in classes to educate himself on meeting his children's needs. Father does not argue that he requested to be included or educated on these items, nor does he argue how he would be able to meet the children's special physical needs, considering that he himself needs someone with him 24/7 due to his seizures and that he had relied on Mother and his own mom to guide him in making decisions and caring for the children. The trial court was entitled to

58

find that this factor weighed in favor of terminating Father's parental rights to Keith and Connor.

The emotional and physical danger to the children now and in the future included being exposed to Father's mom (who had reason-to-believe dispositions for allegations involving her abusive and neglectful treatment of Mother and Father) because Father lived with her and only trusted her or Mother to care for the children while he worked. There were also allegations of food insecurity and medical neglect of Keith when he lived with Father's mom and Father. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Keith and Connor.

As for Father's parenting abilities and his acts or omissions that demonstrate that the existing parent–child relationship is not a proper one, the prior two factors detail Father's acts and omissions and demonstrate that Father lacks the parenting skills, including autonomous decision-making, necessary to care for the children's needs. Additionally, he attended only eight visits. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Keith and Connor.

Regarding the programs available to assist Father to promote the children's best interest, the record demonstrates that Father did not complete all of the services on his plan; specifically, he did not complete the tasks that were added in August 2022, including requiring him to find a life-skills mentor, to demonstrate an ability to

make autonomous decisions, and to undergo a mental-health assessment. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Keith and Connor.

The Department's plan for the children up until the second trial date was for the children to live with Father's sister in California, but she removed herself from consideration after being threatened by her mother (Father's mom). The Department then altered its plan, requesting the trial court to allow the children to stay in their current long-term foster placement while the Department continues to search for a placement that is adoption motivated. If the children were returned to Father, he planned to move them out of Texas (along with Mother and his mom). The trial court was entitled to find that this factor was neutral.

As for the stability of the proposed home or placement, the children had been with the same foster parents throughout the duration of the case (since October 2021). Although Father claims that he has resided in one home for the duration of the case, the record demonstrates that after Father was released from jail, he resided in a shelter for an unspecified length of time, lived with his mom, ran away with Mother, and then returned to his mom's home. The trial court was entitled to find that this factor weighed in favor of termination.

As for any excuses for Father's acts or omissions that indicate that the existing parent–child relationship is not a proper one, Father blamed the police for taking his kids away from him when he had no one in Texas to pick them up. Father did not

take any responsibility for his children being in the Department's care. The trial court was entitled to find that this factor weighed in favor of termination.

Based on all the evidence and applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights to Keith and Connor was in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733. Accordingly, we overrule Father's fifth issue.

## VII. Conclusion

Having overruled Mother's second, third, fourth, and fifth issues, which are dispositive of her appeal, we affirm the trial court's corrected order terminating her parental rights to Keith and Connor. Having sustained Father's first issue regarding the termination of his parental rights under Section 161.002(b), we modify the corrected termination order to delete Sections 3.2, 3.2.1, and 3.2.2 that terminated Father's parental rights to Connor based on Section 161.002(b). But having overruled Father's third, fourth, and fifth issues regarding the termination of his parental rights under Section 161.001(b), we affirm as modified the trial court's corrected order terminating Father's parental rights to Keith and Connor.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: October 5, 2023

61